UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

CECELETA MAITLAND, MD,

        Plaintiff,


        -against-                **COMPLAINT WITH JURY TRIAL DEMAND**
                                       Civil Case No.:
                                       5:21-CV-475 (MAD/TWD)


THE STATE OF NEW YORK, UPSTATE MEDICAL
UNIVERSITY, UPSTATE UNIVERSITY HOSPITAL,
THE STATE UNIVERSITY OF NEW YORK, UNIVERSITY
RADIOLOGY ASSOCIATES, LLP., DAVID FEIGLIN, MD,
ROBERT POSTER, MD, MICHELE LISI, MD, ANDRIJ
WOJTOWYCZ, MD, MAURICE OEHLSEN, MD,
MARISSA MINCOLLA, MD, OLEG SHAPIRO, MD, AMY
TUCKER, MD, LESLIE KOHMAN, MD, MANTOSH
DEWAN, MD, SAURABH GUPTA, MD, JENNIFER
BENJAMIN, MD, LISA QI WANG, MD, each individually
and in their capacities as members of UPSTATE UNIVERSITY
HOSPITAL, UPSTATE MEDICAL UNIVERSITY and/or
UNIVERSITY RADIOLOGY ASSOCIATES, LLP,

        Defendants.

_____


## <u>COMPLAINT</u>


    Plaintiff, Ceceleta Maitland, by and through her attorney, Jeffrey R. Parry,

Esq., as and for his complaint, alleges as follows:

## NATURE OF THE ACTION
### (summary)

Plaintiff, Ceceleta Maitland, is a physician, practicing in radiology for some 20 years. Prior to that she was a nurse. She is a woman over 40 years of age and a single mother of two. She is of African American decent and was born in Jamaica. Dr. Maitland was hired by defendants Upstate Medical University, Upstate University Hospital and University Radiology Associates, LLP., her employment to begin on or about February 1, 2019. She had a positive employment history at all off her previous positions.

However, and unbeknownst to her, Dr. Maitland was hired pursuant to a mandated affirmative action plan and, almost immediately after her date of hire, she was subject to various oppressive and belittling actions by the defendants in an effort to make her leave. These acts were many, varied in nature but not in intent and included falsifications of her record, misreporting of her activities both personal and clinical, biased evaluation of her work history, slanderous and unprofessional beratement conducted before patients and colleagues, racial epithets and the toleration of racial epithets by peers and supervisors together with other

2

discriminatory and insulting actions leading to a hostile and intolerable work environment. Ultimately, she was fired.

Moreover, actions taken against Dr. Maitland were, in each instance, in stark contrast to non-minority employees in like or similar situations.

This is a civil action seeking damages arising out of Defendants' violation of the rights secured by Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e et seq. and the Age Discrimination in Employment Act of 1964 (ADEA), by Section 740 of the New York State Labor Law otherwise known as the Whistleblower Act, by Defendants' defamatory statements and by common law tort.

## <u>JURISDICTION</u>

This Court has original jurisdiction in this action pursuant to 28 U.S.C. Sections 1331 and 1343 and 42 U.S.C. Section 2000e-5, inasmuch as the matter in controversy is brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e et seq. and Age Discrimination in Employment Act of 1964 (ADEA), and the regulations governing federal employees, 29 C.F.R. §1614.407. The jurisdiction of this Court is invoked to secure protection and redress deprivation of rights guaranteed by federal law, which rights provide for injunctive

relief and other relief for illegal employment discrimination. The amount in controversy in this action exceeds the jurisdictional limits of this Court.

## **VENUE**

Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omission giving rise to Plaintiffs' claims occurred in this district and the Plaintiffs and Defendants reside in the Northern District of New York. As well, This District possesses venue of this matter pursuant to 42 U.S.C. Section 2000e-5(f).

## **JURY DEMAND**

Plaintiff respectfully demands a trial by jury of all issues in this matter, including but not limited to damages.

## **CONDITIONS PRECEDENT**

A Notice of Claim was duly served upon the necessary government entities within the appropriate time period and in accordance with General Municipal Law §50-e and §50i.

Plaintiff has received a "right to sue" determination from the Equal Employment Opportunity Commission.

## THE PARTIES

### Plaintiff – Ceceleta Maitland

1.     Plaintiff Ceceleta Maitland (hereinafter "Dr. Maitland", "Maitland" or "Plaintiff") is an adult female who currently resides in the Northern District of New York. She is a physician, duly licensed to practice in the State of New York.

2.     Dr. Maitland was an employee of defendants Radiology Associates, LLP., Upstate University Hospital, Upstate Medical University, the State University of New York and the State of New York.

3.     Plaintiff Dr. Maitland was hired as part of a State mandated affirmative action program.

4.     Dr. Maitland is a African-American female of the age of 63. She is of Jamaican descent.

## DEFENDANTS

5.     Defendant the State of New York is a state that owns and operates the public entities that appear herein.

6.      Defendant Upstate Medical University is, primarily, a graduate school consisting of four colleges with educational programs that train healthcare, medical and biomedical research professionals. It is part of the State University of New York system (SUNY) and is located in the City of Syracuse, County of Onondaga, State of New York.

7.      Defendant Upstate University Hospital is a hospital owned and operated by the State of New York. It is located in the City of Syracuse, County of Onondaga, State of New York.

8.      The State University of New York (hereinafter "SUNY") is a system of public colleges and universities in New York State. It controls and administers defendant Upstate Medical University. It is headquartered in Albany, N.Y.

9.      University Radiology Associates, LLP. Is a domestic limited liability partnership formed pursuant to Section 121-1500(a) of the Partnership Law. It is composed of professionals engaged in the practice of radiology. Membership is a prerequisite for practice in the Radiology Department at Upstate University Hospital. It is located in the City of Syracuse, County of Onondaga, State of New York.

10.     David Feiglin, M.D, is the Chairman of the Radiology Department at Upstate University Hospital and Upstate He is also Director of Radiology Associates, LLP. He resides in Central New York.

11.     Robert Poster, M.D. is a radiologist practicing at the Radiology Department at Upstate University Hospital and Upstate Medical University. He is a Partner at Radiology Associates, LLP. He resides in Central New York.

12.     Michele Lisi, M.D. is a radiologist practicing at the Radiology Department at Upstate University Hospital and Upstate Medical University. He is a Partner at Radiology Associates, LLP. She resides in Central New York.

13.     Andrij Wojtowycz, M.D. is a radiologist practicing at the Radiology Department at Upstate University Hospital and Upstate Medical University. He is a Partner at Radiology Associates, LLP. He resides in Central New York.

14.     Maurice Oehlsen, M.D. is a radiologist practicing at the Radiology Department at Upstate University Hospital and Upstate Medical University. He is a Partner at Radiology Associates, LLP. He resides in Central New York.

15.     Marissa Mincolla, M.D. is a radiologist practicing at the Radiology Department at Upstate University Hospital and Upstate Medical University. He is a Partner at Radiology Associates, LLP. She resides in Central New York.

7

16.     Oleg Shapiro, M.D., is a urologist practicing at Upstate University Hospital and Upstate Medical University. He resides in Central New York.

17.     Amy Tucker, M.D. is a cardiologist practicing at Upstate University Hospital and Upstate Medical University. She holds several supervisory positions in both entities. She resides in Central New York.

18.     Leslie Kohman, M.D. is a surgeon practicing at Upstate University Hospital and Upstate Medical University. She resides in Central New York.

19.     Mantosh Dewan, M.D. is a psychiatrist practicing at Upstate University Hospital and Upstate Medical University. He is President of Upstate Medical University. He resides in Central New York.

20.     Saurabh Gupta, M.D. is a radiologist practicing at the Radiology Department at Upstate University Hospital and Upstate Medical University. He is a Partner at Radiology Associates, LLP. He resides in Central New York.

21.     Jennifer Benjamin, M.D. is a radiologist practicing at the Radiology Department at Upstate University Hospital and Upstate Medical University. She is a Partner at Radiology Associates, LLP. She resides in Central New York.

22.     Lisa Qi Wang, M.D. was, at times relevant to this action, a resident radiologist practicing in the Radiology Department at Upstate University Hospital and Upstate Medical University.

## FACTUAL ALLEGATIONS

23.     Plaintiff, Ceceleta Maitland, M.D., is a licensed physician in the State of New York.

24.     Dr. Maitland practices in the area of radiology. Notably, she is Fellowship trained at the University of Pennsylvania School of Medicine.

25.     Dr. Maitland is female, 63 years old and she is a single mother of two.

26.     Dr. Maitland is African-American and she was born in Jamaica.

27.     Dr. Maitland most recently practiced at Albany Medical Center.

28.     Dr. Maitland accepted a position at Upstate University Hospital, Upstate Medical University and University Radiology Associates, LLP with a start date of February 1, 2019.

29.     Unbeknownst to Dr. Maitland, she was hired as part of a required affirmative action program.

30.     At the time she was hired, Dr. Maitland's residence was in the Albany area. She commuted to work 2.5 hours one way.

31.     Dr. Maitland's supervisors were aware that she had not yet relocated to the Syracuse area.

32.     Dr. Maitland was required to complete certain documents with Human Resources (hereinafter "HR") as part of being a new hire.

33.     Dr. Maitland requested time to attend an appointment with HR from one of her supervisors, Dr. Poster.

34.     Dr. Poster allowed her to attend during her lunch period.

35.     When the appointment with HR took somewhat longer than expected, Dr. Poster accused Dr. Maitland of "abandoning her post".

36.     Dr. Poster reported Dr. Maitland's HR visit to Dr. Feiglin, the department Chairman, as "abandoning of her post".

37.     On March 14, 2019, Dr. Feiglin required Dr. Maitland to attend a meeting with him and Dr. Poster.

38.     Dr. Maitland was castigated for having attended her permitted meeting and necessary meeting with HR.

39.     Dr. Feiglin revealed that he had obtained photographs of Dr. Maitland coming and going from the parking lot.

40.     Dr. Feiglin reprimanded Dr. Maitland for being late for work in spite of her 2.5 hour commute everyday.

41.     Other physicians, although late for work, had not been tracked and photographed even though they had a less valid excuse for being late.

10

42.     A "reading" refers to a physician's examination of an x-ray or similar scan of a patient.

43.     Dr. Feiglin accused Dr. Maitland of having done an insufficient number of readings per day and referred to her as unproductive.

44.     Dr. Maitland informed Dr. Feiglin that this was so because there was simply not enough work to do.

45.     In fact, Dr. Maitland had requested more work from Dr. Poster and Dr. Mincolla.

46.     In another matter, and within two weeks of her hire date, Dr. Mincolla accused Dr. Maitland of unprofessional conduct when she utilized "Bosniak criteria" to measure a lesion.

47.     Her use of the Bosniak criteria was sharply criticized by Dr. Shapiro and Dr. Mincolla.

48.     Nevertheless, Bosniak criteria is the standard method in the profession and Dr. Maitland had no reason to deviate from it.

49.     Dr. Shapiro simply wants to use other methods although he did not inform Dr. Maitland, denigrated her for it and reported her to the department chairman.

50.     On June 20, 2019, Dr. Maitland called in sick.

51.     When she remained in bed and did not come to work, she was informed that this was not allowed.

52.     Dr. Maitland was required to pay someone to fill in for her and she did so.

53.     The next day, Dr. Mincolla rudely chastised Dr. Maitland for taking a sick day.

54.     This policy was reiterated at a staff meeting a few months later.

55.     However, at that staff meeting, Dr. Wojtowycz indicated openly that he would not abide by the policy.

56.     Dr. Wojtowycz was not taken to task or in any way punished for refuting the policy that Dr. Maitland was forced to abide by.

57.     On July 17, 2019, Dr. Feiglin crudely and loudly accused Dr. Maitland of "abandoning her post" in front of her colleagues.

58.     In fact, Dr. Maitland had only been in the ladies room when efforts were made to find her.

59.     Nevertheless, the situation was forwarded to hospital management and QA for review.

60.     Another doctor of the white race encountered a similar situation but was not reported for it.

61.     In October of 2019, Dr. Feiglin scheduled a meeting with Dr. Maitland and Dr. Mincolla to discuss complaints made by Dr. Wang.

62.     Dr. Wang was, at that time, a resident being trained in part by Dr. Maitland.

63.     Dr. Wang was noted by supervisors and staff to be difficult and confrontational.

64.     Dr. Wang became confrontational with Dr. Maitland and used foul language towards her before others.

65.     When Dr. Maitland reported Dr. Wang to Dr. Wojtowycz, the residency coordinator, Dr. Maitland was reprimanded while Dr. Wang was not.

66.     The actual meeting was had on November 4, 2019.

67.     The meeting focused on trivial issues.

68.     Nevertheless, Dr. Feiglin issued a counseling letter that was both aggressive and inaccurate.

69.     In the aftermath of the meeting it became known that supervisors were canvassing residents to acquire ill comments of Dr. Maitland.

70.     As well, the quality of other physician's work was called into question by other departments but, they were not "counseled" or otherwise held responsible.

71.     On or about November 5, 2019, Dr. Wojtowycz publicly accused Dr. Maitland of not teaching the residents properly when a patient was over-radiated.

72.     In fact, a resident had made the mistake and Dr. Wojtowycz privately retracted his accusation.

73.     Nevertheless, Dr. Maitland was publicly humiliated before the very residents she was supposed to teach.

74.     Further, and even though Dr. Wojtowycz had apologized, he and Dr. Feiglin made disparaging remarks directed at Dr. Maitland in the November staff meeting.

75.     Dr. Maitland desired to bring her children to work for a day because of the chaotic nature of her move to Syracuse, difficulty getting daycare services, etc.

76.     Dr. Mincolla, Dr. Maitland's section chief, gave her permission to do so.

77.     In spite of the fact that Dr. Maitland had received permission and that her children were well behaved, Dr. Feiglin specifically brought the matter up in the November meeting in such a way as to embarrass Dr. Maitland.

78.     Moreover, Dr. Feiglin opined that such an act as bringing children to work would be alright if a father or spouse were picking them up.

79.     Dr. Maitland, as mentioned above, is a single mother.

80.     This public reprimand left Dr. Maitland extremely shaken.

81.     In December of 2019, it became known that Dr. Mincolla was publishing one of Dr. Maitland's reports around the department.

82.     He made light of the report because it had one typographical error in it.

83.     A counseling letter was issued in November 2019 questioning Dr. Maitland's reporting. The entire issue stems from the above-mentioned typographical error.

84.     In March of 2020, Dr. Wang made several errors in reading certain cases.

85.     At least one was a misdiagnosis.

86.     Importantly, Dr. Maitland brought these errors to Dr. Lisi's attention and voiced the opinion that the performance of several residents was inadequate.

87.     Upon information and belief, nothing was done to rectify this situation nor, were the residents reprimanded.

88.     As the Covid pandemic worsened, Dr. Maitland was allowed to work from home with hours that ran into the very late evening. In essence, she was working "night shift" hours although at home.

89.     Nevertheless, Dr. Feiglin gave her tasks to be accomplished during the day though he knew that she would normally be sleeping during those hours.

90.     Dr. Wang was noted to continue to defame Dr. Maitland during the spring of 2020.

91.     Dr. Wang's unprofessional conduct was brought to the attention of Dr. Lisi by Dr. Benjamin.

92.     Dr. Wang continuously spread rumors as to Dr. Maitland's lack of competence.

93.     This was reported to Dr. Lisi.

94.     Although Dr. Maitland's ability to teach the residents was being compromised and her job was, as a result, becoming more difficult, nothing was done.

95.     On April 23, 2020, Dr. Feiglin issued a number of complaints indicating his anger that Dr. Maitland was not returning his emails and/or mail correspondence.

96.     Both Dr. Feiglin's emails and his mail correspondence were either improperly addressed or were addressed in such a way as to go unnoticed.

97.     As such, Dr. Maitland did not immediately receive the highly insulting email of April 29, 2020 which threatened to remove pay from her monthly salary.

98.     It contained further complaints that were ostensibly from residents but were unspecified as to both the nature of the complaint and the complainant as well.

99.     Dr. Wang was certainly one of the complainants but others could not be identified.

100.    Dr. Maitland was under the impression that her relationship with her students was generally good.

101.    The April 29th letter made Dr. Maitland physically ill such that she could not work.

102.    Nevertheless, Dr. Maitland was required to work for half a day.

103.    Even though she worked for half a day while ill, at Dr. Feiglin's direction, her time sheet was changed such that it appeared she had not worked that day.

104.    She was not compensated for this time.

105.    Biased remarks and questions made to the residents by supervisors and staff caused a negative opinion to arise about Dr. Maitland.

106.    As such, Dr. Maitland received a biased evaluation score from the residents. Dr. Wang was highly active in voicing negative views.

107.    The resident complaints were unfounded nevertheless; they were kept anonymous.

108.    Dr. Mincola convened a meeting with the residents on or about May 12, 2020. Dr. Maitland was openly raised as a topic of discussion.

109.    The residents voiced generally favorable opinions of Dr. Maitland while voicing general disagreement as to the opinions of Dr. Wang.

110.    Dr. Maitland attempted to complain about these disparities but her complaints went unaddressed. However, a white physician in similar circumstances with the resident evaluations was allowed to voice a complaint in writing and was afforded the courtesy of a hearing.

111.    Dr. Maitland complained to her Union as to all of the above and, on May 7, 2020, Dr. Feiglin retaliated by informing her that he would be pulling her reports randomly to check for errors.

112.    After numerous inquiries, Dr. Maitland remains unaware as to what reports were pulled and what errors, if any, were identified. Dr. Feiglin will not disclose them.

113.   Upon information and belief, the reports were not pulled at random and were not reviewed without bias.

114.   Dr. Feiglin made numerous references to "remediation" for Dr. Maitland to keep her job.

115.   Remediation was never mentioned for any other physician and was insulting to a woman of Dr. Maitland's training, education and long experience. Dr. Maitland submitted a formal complaint to the Office of Diversity and Inclusion on May 18, 2020.

116.   Dr. Oehlsen made racially charged remarks concerning Dr. Maitland and African-Americans generally; comparing her to Aunt Jemimah and impugning her intelligence.

117.   Dr. Feiglin filed a complaint with the Office of Diversity and Inclusion.

118.   She further filled a complaint wit the Equal Employment Opportunity Commission (EEOC).

119.   In December of 2020, the Office of Diversity and Inclusion concluded their investigation of Dr. Oehlsen "more likely than not" uttered remarks about Dr. Maitland that violated the organization's ethics code.

120.   Upon information and belief, no action of any kind has been taken against Dr. Oehlsen.

121.   Dr. Maitland has received her "right to sue" letter from the EEOC as noted above.

122.   In retaliation for the above, Dr. Maitland was terminated from her position at University Radiology Associates, PLLC.

123.   In further retaliation for the above, Dr. Maitland was terminated from her position at Upstate University Hospital and Upstate Medical University.

124.   In further retaliation for the above, an untrue and defamatory statement concerning Dr. Maitland was caused to be published on the National Practitioner Data Bank.

125.   Upon information and belief, in the summer of 2020, Dr. Feiglin made a complaint to the Accreditation Council for Graduate Medical Education as to the adequacy of his own program.

126.   In return, defendant administrators, and particularly Dr. Dewan took steps to fire Dr. Feiglin.

127.   On March 23, 2021, Dr. Feiglin announced his departure.

128.   Upon information and belief, Dr. Feiglin remains at his position only through an employment extension granted by his employers.

129.   Upon information and belief, the radiology department is under investigation as to their shortcomings in education and practice.

130.   In spite of being aware of this situation and the obvious conflict of interest, defendants Upstate University Hospital, Upstate Medical University and University Radiology Associates, LLP continued to take Dr. Feiglin's word as to Dr. Maitland's abilities, professionalism, honesty and competence.

131.   Moreover, they allowed Dr. Feiglin to dictate policy and supervise programs, including hiring, discharge and affirmative action, when his management abilities were at best suspect and compromised.

## COUNT I
## RACIAL DISCRIMINATION

132.   Plaintiff incorporates the above paragraphs as if fully restated herein.

133.   During the course of Plaintiff's employment with Defendants, the Defendants, by and through its agents and employees, discriminated against the Plaintiff in the terms, conditions, and privileges of employment in various ways, in substantial part because of her race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et. seq.

134.   The above-described unwelcome acts of racial discrimination created an intimidating, oppressive, hostile and offensive work environment which interfered with Plaintiff's emotional and physical well-being.

135.   As a result of the hostile and offensive work environment perpetrated by Defendant's agent and by the Defendants failure to protect Plaintiff from such discrimination, the Plaintiff suffered humiliation, emotional distress, and physical pain.

136.   Defendants through their agents or supervisors failed to adequately supervise, control, discipline, and/or otherwise penalize the conduct, acts, and failures to act as described above.

137.   Defendants failed to take all reasonable and necessary steps to eliminate racial discrimination from the workplace and to prevent it from occurring in the future.

138.   As a further direct and proximate result of Defendant's violation of Title VII of the Civil Rights Act of 1964 as described, Plaintiff has been compelled to retain the services of counsel in an effort to enforce the terms and conditions of the employment relationship and has thereby incurred and will continue to incur legal fees and costs, the full nature and extent of which are presently unknown to Plaintiff.

## COUNT II
## SEX DISCRIMINATION

139.   Plaintiff incorporates as if fully restated all of the allegations previously written.

140.   During the course of Plaintiff's employment with Defendants, the Defendants, by and through its agents and employees, discriminated against the Plaintiff in the terms, conditions, and privileges of employment in various ways, in substantial part because of her sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et. seq.

141.   The above-described unwelcome sex discrimination created an intimidating, oppressive, hostile and offensive work environment which interfered with Plaintiff's emotional and physical well-being.

142. As a result of the hostile and offensive work environment perpetrated by Defendant's agent and by the Defendants failure to protect Plaintiff from such discrimination, the Plaintiff suffered humiliation, emotional distress, and physical pain.

143.   Defendants through their agents or supervisors failed to adequately supervise, control, discipline, and/or otherwise penalize the conduct, acts, and failures to act as described above.

144.   Defendants failed to take all reasonable and necessary steps to eliminate sex discrimination from the workplace and to prevent it from occurring in the future.

145.   As a further direct and proximate result of Defendant's violation of Title VII of the Civil Rights Act of 1964 as described, Plaintiff has been compelled to retain the services of counsel in an effort to enforce the terms and conditions of the employment relationship and has thereby incurred and will continue to incur legal fees and costs, the full nature and extent of which are presently unknown to Plaintiff.

## RETALIATION

146.   Plaintiff incorporates as uf fully restated all of the allegations previously written.

147.   Defendants have engaged in unlawful retaliatory practices in violation of Section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a) by suspending and

terminating the employment of Dr. Maitland because she opposed discriminatory practices and participated in an EEOC proceeding.

148. The effect of the events described above has been to deprive Dr. Maitland of equal employment opportunities in retaliation for exercising her federally protected rights.

149.   The unlawful employment practices described above were intentional.

150.   The unlawful employment practices described above were done with malice or with reckless indifference to the federally protected rights of Dr. Maitland.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for a judgment as follows:

1. That the Court order Defendants to reinstate Plaintiff's employment;

2. That the Court grant full front pay to the Plaintiff;

3. That the Court grant full back pay to the Plaintiff;

4. That the Court grant Plaintiff compensatory damages for the humiliation, emotional distress, and other damages caused by Defendants' conduct;

5. That the Court grant Plaintiff punitive damages for Defendants' malicious and recklessly indifferent conduct;

6. That the Court grant Plaintiff all employment benefits she would have enjoyed had she not been discriminated and retaliated against;

7. That the Court grant Plaintiff expenses of litigation, including reasonable attorneys' fees, pursuant to the Title VII, and/or 42 U.S.C. § 1988;

8. That the Court grant Plaintiff a jury trial;

9. That the Court grant Plaintiff all other relief the Court deems just and proper; and,

10. That the Court grant temporary, preliminary, and permanent injunctive relief prohibiting Defendants from engaging in further discriminatory conduct.

Respectfully submitted this 25th day of April 2021.

*Jeffrey Parry*

Jeffrey R. Parry
Bar Roll No.: 508023
Attorney for the Plaintiff
7030 East Genesee Street
Fayetteville, New York 13066
(315)424-6115
JeffreyParry404@gmail.com

26